*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LEAGUE OF WOMEN VOTERS OF MICHIGAN,
DEBORAH BUNKLEY, ELIZABETH CUSHMAN,
and SUSAN SMITH,

        Plaintiffs,

v

SECRETARY OF STATE,

        Defendant.

FOR PUBLICATION
July 14, 2020

No. 353654

Before: SAWYER, P.J., and GLEICHER and RIORDAN, JJ.

GLEICHER, J. (*concurring in part and dissenting in part*).

"All political power is inherent in the people." Const 1963, art 1, § 1. Before November 2018, Michigan's Constitution afforded the people only rudimentary protection of their right to exercise their political power as voters. Article 2 contained 10 sections describing the formal prerequisites for voting and delineating the procedural framework governing elections. But our Constitution lacked an affirmative declaration of specific voting rights.

That changed when the people overwhelmingly approved Proposal 3, a constitutional amendment establishing the following substantive voting rights:

- To vote a secret ballot;

- To vote an absent voter ballot without giving a reason;

- To vote an absent voter ballot during the forty (40) days before an election;

- To apply for and receive an absent voter ballot in person or by mail; and

- To submit an absent voter ballot in person or by mail.

Here are the relevant words the people approved:

(1) Every citizen of the United States who is an elector qualified to vote in Michigan shall have the following rights:

    (a) The right, once registered, to vote a secret ballot in all elections.

* * *

    (g) The right, once registered, to vote an absent voter ballot without giving a reason, during the forty (40) days before an election, and the right to choose whether the absent voter ballot is applied for, received and submitted in person or by mail. [Const 1963, art 2, § 4.]

My colleagues hold that despite the clear and unambiguous language of Proposal 3 establishing a right to vote by mail, an absent voter who mails her ballot has no constitutional right to have that ballot counted if the ballot arrives after election day. This holding contravenes the language of the Constitution and the intent of the voters. I respectfully dissent.

I

The central issue presented is whether Article 2, § 4 compels the Secretary of State to count mailed ballots that arrive after 8 p.m. on election day. A trio of Michigan laws enacted before Proposal 3's passage, read together, prevent the Secretary of State from counting absent voter ballots that arrive in the clerk's office after the close of the polls. MCL 168.764b(1) states: "An absent voter ballot must be delivered to the clerk only as authorized in the instructions for an absent voter provided in section 764a." MCL 168.764a sets out step-by-step "instructions for an absent voter." "Step 6" provides: "The ballot must reach the clerk or an authorized assistant of the clerk before the close of the polls on election day. An absent voter ballot received by the clerk or an authorized assistant of the clerk after the close of the polls on election day will not be counted." And MCL 168.765 instructs: "If a marked absent voter ballot is received by the clerk after the close of the polls, the clerk shall plainly mark the envelope with the time and date of receipt and shall file the envelope in his or her office." MCL 168.765(4).[1] Plaintiffs contend that this statutory framework cannot be reconciled with the right to vote by mail enshrined in Article 2, § 4. They seek an order of mandamus compelling the Secretary of State to count properly voted, timely mailed absent voter ballots regardless of when they arrive in the clerk's office.

My colleagues find no conflict between these existing election laws and the constitutional guarantee of a right to vote by mail. The lead opinion declares that despite full compliance with all absentee voting rules, absentee voters must simply "assume[] the risk" that a mailed ballot won't arrive in time to be counted. Specifically acknowledging that voters now have the right to "submit" their ballots by mail, the lead opinion illogically terminates the right at that moment, negating the constitutional language the people approved.

---

[1] MCL 168.765a(6), as enacted by 2020 PA 95, effective June 23, 2020, requires that absent voter ballots received by the clerk *before* the close of the polls must be delivered "to the absent voter counting boards" established pursuant to the same public act.

A

City and township election clerks are authorized to mail absent voter ballots to voters until 5 p.m. on the Friday before a Tuesday election. MCL 168.759(1). Evidence presented to this Court substantiates that most first-class mail is delivered within two to five days. Assume a voter's timely application for an absent voter ballot arrives at the clerk's office on the Thursday or Friday before an election, and that the clerk mails the ballot on Friday.[2] A ballot mailed to a voter on a Friday is unlikely to land in the voter's hands before the following Monday. Assume further that the voter immediately fills in the ballot and places it in the mail. That ballot will not arrive in the clerk's office until after election day. And depending on the efficiencies of the United States Postal Service, even ballots mailed to the clerk on the Thursday, Friday or Saturday before an election may not arrive until *after* election day. These scenarios are not far-fetched. According to data supplied by the Secretary of State, during the May 2020 primary election, 3,307 absentee ballots (1.75% of those cast) arrived too late to be counted.[3] Voters who followed all the rules were nevertheless disenfranchised.

Plaintiffs assert that Michigan's current election laws unconstitutionally constrain the Secretary of State from counting properly mailed absentee ballots that arrive after the close of the polls on election day. They seek an order of mandamus compelling the Secretary to perform her clear legal duty to direct the counting of such votes. The lead opinion lays out a smorgasbord of reasons for rejecting plaintiffs' arguments, all boiling down to one fundamentally incorrect premise: that Article 2, § 4 allows voters the right to "cast" their ballots by mail, to "submit" their ballots by mail, and to "mail" their ballots, but does not grant them the right to have their votes *counted*.

---

[2] MCL 168.761(1) provides that upon receipt of a valid application for an absent voter ballot, "the clerk immediately" must mail the absent voter ballot. The Election Officials' Manual published by the Michigan Bureau of Elections states: "A request for an absentee ballot must be processed immediately. It is recommended that the ballot be issued within 24 hours of the receipt of the application." Available at <https://www.michigan.gov/documents/sos/ VI_Michigans_Absentee_Voting_Process_265992_7.pdf>, p 5.

[3] Plaintiffs' proofs reveal that in the March 2020 primary election, more than 150,000 voters requested an absentee ballot during the week before the election. The number of absentee voters increased substantially in the May 2020 election, undoubtedly due in part to the Covid-19 crisis and voters' fear of infection from standing in voting lines. Failing to count even a relatively small number of late-arriving absentee ballots can make all the difference. President Trump's margin in the 2016 presidential election was only 10,704 votes in Michigan. If 45% of eligible voters vote by absentee ballot in November 2020 and 1.75% of those votes are not counted because they arrived after the close of the polls on election day, more than 41,000 absent voters will be disenfranchised.

B

"[T]here is no more constitutionally significant event than when the wielders of all political power . . . choose to exercise their extraordinary authority to directly approve or disapprove of an amendment" to our state's Constitution. *Citizens Protecting Mich's Constitution v Secretary of State*, 503 Mich 42, 59; 921 NW2d 247 (2018) (cleaned up).[4] In ascertaining the meaning of an amendment's words, we are guided by "the rule of 'common understanding' " described by Justice COOLEY. *Traverse City Sch Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971). The words the voters selected and approved, Justice COOLEY instructed, point the truest course to constitutional meaning. *Id.* Ultimately, " '[t]he intent to be arrived at is that of the people[.]' " *Id.*, quoting Cooley, Constitutional Limitations (7th ed), p 81. We locate meaning "by applying each term's plain meaning at the time of ratification." *Nat'l Pride At Work, Inc v Governor*, 481 Mich 56, 67-68; 748 NW2d 524 (2008).

The words added by Proposal 3 are not difficult to parse. Voters now have the right to "vote" by mail. What did the voters understand voting by mail to mean? By enlarging the right to vote to include voting by a mailed ballot, the people dictated that the votes of absent voters would be *counted*. A right to vote by mail is a hollow right indeed if one's mailed vote is thrown in a wastebasket or placed in a file. See MCL 168.765.

"The right to vote has always received a preferred place in our constitutional system. The importance of this right can hardly be overemphasized. It is the basic protection that we have in insuring that our government will truly be representative of all of its citizens." *Mich State UAW Community Action Program Council v Secretary of State*, 387 Mich 506, 514; 198 NW2d 385 (1972). The meaning of the phrase "to vote" is deeply engrafted in our state and federal jurisprudence. Voting encompasses more than merely checking boxes on a form or pulling levers in a booth. "To vote" means to express a personal political preference *and to have that preference counted*. Voting is "a fundamental political right because [it is] preservative of all rights." *Yick Wo v Hopkins*, 118 US 356, 370-371; 6 S Ct 1064; 30 L Ed 220 (1886). Voting achieves this sacred place in our democratic pantheon because every vote matters. And that was the common understanding of the people who added specific language establishing specific voting rights to Article 2.

A court may discern constitutional meaning by reviewing the existing legal framework surrounding a new provision. See *People v Nutt*, 469 Mich 565, 567; 677 NW2d 1 (2004). Even a cursory review of the preexisting law surrounding voting confirms that the common understanding of the term "to vote" necessarily incorporates the right to have one's vote counted. Long ago, our own Justice COOLEY recognized in a concurring statement the "right" of "the electors . . . to have their votes counted and allowed in the general result." *People ex rel Dickinson v Sackett*, 14 Mich 320, 331 (1866) (COOLEY, J., concurring). One hundred years ago, our Supreme Court endeavored to protect "the constitutional right of every voter to vote for every officer to be

---

[4] This opinion uses the new parenthetical "cleaned up" to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, *Cleaning Up Quotations*, 18 J App Pract & Process 143 (2017).

elected and to have his vote so counted as to have equal value and potentiality with the vote of every other elector who votes." *Wattles v Upjohn*, 211 Mich 514, 533-534; 179 NW 335 (1920).

The United States Supreme Court has consistently acknowledged that "the right to have one's vote counted has the same dignity as the right to put a ballot in a box." *Gray v Sanders*, 372 US 368, 380; 83 S Ct 801; 9 L Ed 2d 821 (1963) (cleaned up). In *Reynolds v Sims*, 377 US 533, 555; 84 S Ct 1362; 12 L Ed 2d 506 (1964), a foundational voting rights case, the Supreme Court again highlighted the indisputable principle that "[o]bviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted." (Cleaned up.) More recently, in *Wisconsin v City of New York*, 517 US 1, 12; 116 S Ct 1091; 134 L Ed 2d 167 (1996), the Supreme Court again referenced the "fundamental right . . . to have one's vote counted."

But we do not need to consult the caselaw to discern the meaning of "to vote." We stand in long lines at polling places, too often in inclement weather and sometimes sacrificing our wages and our health, because we know that "all political power is inherent in the people." We vote to make a difference in our national, state or local governance, or to demonstrate our satisfaction with the status quo. We vote to select our leaders, to directly enact or repeal our laws, or to change our Constitution. We vote because we understand that voting is the key to a healthy democracy, that voting empowers "we the people." We vote because we have taken to heart that every vote counts.

The people who amended our Constitution in 2018 understood that the right to vote necessarily embodies the right to have one's vote counted. "The simplest and most obvious interpretation of a constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption." *Lake Co v Rollins*, 130 US 662, 671; 9 S Ct 651; 32 L Ed 1060 (1889). And any possible doubt about what the people intended by empowering mailed voting is dispelled by subsection (g) of Article 2, § 4, assiduously ignored by my colleagues, instructing that "[t]his subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

II

Const 1963, art 2, § 4, as amended, grants registered voters the right "to vote an absent voter ballot without giving a reason during the forty (40) days before an election." The amendment additionally grants to registered voters "the right to choose whether the absent voter ballot is applied for, received and submitted in person or by mail." These are simple words. We do not need a dictionary to understand any of them. In everyday parlance, the amendment says that registered voters can apply for and receive their ballots through the mail. After filling out their ballots, voters can mail their ballots back to the clerk.

This case should be easy. Because voters have a right to vote by mail if they mail their ballots to the clerk during the 40 days before an election, they have the right to have their votes counted when those votes arrive in the clerk's office. This interpretation squares with the historical and legal meaning of voting. It corresponds with the voters' intent.

Remarkably, in the middle of its meandering analysis of Article 2, § 4 the lead opinion essentially acknowledges that I am right. As to the voters' right to "submit" a ballot by mail, the lead opinion opines: "They certainly possess that right." The lead opinion declaims that it "would

-5-

be absurd" to believe that "all that is guaranteed under Proposal 3 is the right to fill out an absentee ballot, not to have it counted;" the concurrence agrees that voting "necessarily includes" counting cast ballots. The lead opinion even goes so far as to say that any vote-counting deadline "chosen by the Legislature" may not "effectively preclude the ability of a voter to submit their absentee ballot at any point during the 40 days before an election." I wholeheartedly agree with these propositions. And yet the lead opinion manages to talk itself into the "absurd" position it emphatically disdains. My colleague accomplishes this extraordinary turn-around by violating the first principle of constitutional interpretation. Rather than engaging the text, my colleague endeavors to read out of Article 2, § 4 the actual words ratified by the people. Instead, the lead opinion divines constitutional meaning from a "ballot summary."

The ballot summary at the heart of the lead opinion's "common understanding" analysis was approved by the Board of State Canvassers. According to the lead opinion, it does not "address" the right by vote by mail or the deadline for counting votes, omissions that the lead opinion somehow construes as proof that there is *no* right to vote by mail and that the people could not have cared less about "deadlines." In the lead opinion's view, the ballot summary "suggest[s] to voters that there would be some limitations on when election officials would be obligated to accept, and therefore count, ballots." This is an astonishing proposition for two reasons.

First, the lead opinion does not explain why it finds constitutional meaning in a "ballot summary" rather than the plain language of the constitutional text the people overwhelmingly approved. Unless the constitutional language under consideration is ambiguous or susceptible to many different interpretations, courts are forbidden from considering extraneous evidentiary sources. See *Nat'l Pride At Work, Inc*, 481 Mich at 80 ("When the language of a constitutional provision is unambiguous, resort to extrinsic evidence is prohibited."). The words at issue here are not ambiguous, and the ballot summary is utterly irrelevant. "Our obligation is to give the words of our Constitution a reasonable interpretation consistent with the plain meaning understood by the ratifiers. Text that may require reasonable effort to parse is not for that reason ambiguous." *Co Rd Ass'n of Mich v Governor*, 474 Mich 11, 17; 705 NW2d 680 (2005) (cleaned up).

Second, the notion that a ballot summary trumps the words of the Constitution boggles the mind. The lead opinion makes no effort to explain why we should regard a ballot summary as a tool for depriving citizens of specifically enumerated rights they voted to approve. Ballot summaries cannot displace or override enacted words. And make no mistake, the rights to vote absentee and to vote by mail are specifically enumerated and easily understood.

Next, stating the obvious, the lead opinion declares that the voters "certainly possess" the right to "*submit* their absentee ballot[s] by mail," (emphasis added), as well as "to receive and cast" their ballots during the 40 days before an election. The lead opinion defines "the entire process of voting" as beginning by "requesting an application to apply for an absentee ballot" but ending with "the delivery of the completed ballot to the appropriate election officials." In an abrupt analytical shift, the lead opinion announces that *counting* an absent voter's vote is constitutionally irrelevant. And so it must be to justify upholding a deadline disenfranchising thousands of voters who conduct themselves in strict conformity with all voting rules.

Rather than engaging with the actual words the people added to our Constitution, my colleagues instead confer "deadlines" with constitutional magnitude, elevating their importance to

that of the right to vote itself. "[T]here must be a deadline—at some point, the ballots must be counted and a winner declared," the lead opinion inveighs. That deadline is up to the Legislature, we are admonished, and "[t]he courts' role is limited to ensuring that the deadline chosen by the Legislature does not effectively preclude the ability of a voter to submit their absentee ballot at any point during the 40 days before an election." Instead of critically examining the legality of the deadline at the heart of this case, my colleagues suggest that voters just forgo exercising their right to vote by mail if they want their votes counted, and content themselves with the knowledge that the Legislature is working on it.

Of course there must be a "deadline" for counting votes. And there *is* a deadline that permits the Secretary to count absentee ballots mailed before election day but arriving after. MCL 168.842(1) requires the board of state canvassers to "complete the canvass and announce their determination" of the result of a general election "not later than the fortieth day after the election." The canvass deadline for primary elections is 20 days. MCL 168.581. The Secretary has offered no reason that the canvass deadlines should not correspond to the deadline for counting timely mailed absentee ballots.[5]

Our task is not to mindlessly enforce a deadline solely because the Legislature selected it. Rather, we must evaluate whether the Secretary is empowered to enforce a deadline that prevents counting a substantial number of properly mailed ballots, thereby contravening Article 2, § 4. The lead opinion spills considerable ink in its paean to judicial review and the concurrence scolds on the same subject,[6] yet both conveniently forget the central lesson of *Marbury v Madison*, 5 US 137; 2 L Ed 60 (1803): "a statute apparently governing a dispute cannot be applied by judges . . . when such an application of the statute would conflict with the Constitution." *Younger v Harris*, 401 US 37, 52; 91 S Ct 746; 27 L Ed 2d 669 (1971). This case is about whether statutory deadlines stand in the way of the exercise of fundamental constitutional rights. If the statutory deadline conflicts with the exercise of a constitutional right, the Secretary has a duty as a constitutional officer to refrain from enforcing the deadline.

The concurring opinion argues that "there is no evidence that the purpose of the [amendment] was to create an unfettered and absolute right to absentee voting." This is a peculiar statement, given that the amendment manifestly *does* create an explicit right for registered voters

---

[5] It also bears mention that Michigan has a statutory "mailbox rule" applicable to overseas and "uniformed services" votes that operates to extend the deadline for counting absent voter ballots that arrive after the polls close if the clerk failed to "transmit" the ballot more than 45 days before an election. See MCL 168.759a(16).

[6] Reaffirming that this Court is not bound by a concession made by the Secretary's counsel at argument does not require a review of *Marbury v Madison*, 5 US 137; 2 L Ed 60 (1803). And despite counsel's concession corresponding to my position, if the Secretary intended to throw in the towel and admit defeat she would not have actively pursued a defense in this case. Undoubtedly the Secretary and her counsel were aware of Court's holding in *Lantz v Southfield City Clerk*, 245 Mich App 621, 626; 628 NW2d 583 (2001), an absentee voter ballot that does not reach the clerk before the close of the polls on election day "cannot be counted irrespective of the date displayed in the postmark." Capitulation was not an option.

-7-

to vote by mail during the 40 days before an election. Here are the unambiguously stated rights the people ratified: "The right, once registered, to vote an absent voter ballot without giving a reason, during the forty (40) days before an election, and the right to choose whether the absent voter ballot is applied for, received and submitted in person or by mail." It is hard to imagine plainer or more direct language.

Because the right is not "absolute" or "unfettered," the concurrence propounds, it is up to the Legislature to determine its boundaries. Platitudes aside, the pertinent inquiry focuses on whether a statute or regulation burdens the constitutionally protected right to vote by mail. While the Legislature may enact laws regulating voting, the laws may not prevent a voter from voting, "or unnecessarily . . . hinder or impair his privilege." *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 17; 740 NW2d 444 (2007) (cleaned up). "[T]he Legislature may regulate, but cannot *destroy*, the enjoyment of the elective franchise." *Id.* at 18 (cleaned up, emphasis in original). On its face, a deadline preventing properly cast absentee ballots from being counted destroys the rights the people adopted in ratifying Proposal 3.

When considering a voting regulation challenge under the Due Process or Equal Protection Clauses of the federal Constitution, a court must "weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Crawford v Marion Co Election Bd*, 553 US 181, 190; 128 S Ct 1610; 170 L Ed 2d 574 (2008) (cleaned up). Here, plaintiffs' claims rest on a more straightforward argument: the deadline directly violates Michigan's Constitution because it requires the rejection of properly cast ballots. My colleagues ignore this argument and instead recite that the deadline does not "severe[ly] infringe" or "effectively preclude" the right to vote. Although I disagree with these conclusions, placing them in a cognizable legal framework mandates consideration of whether the state has come forward with some reason that the election-day deadline for counting mailed ballots is necessary to "preserve the purity of elections" or to "guard against abuses of the electoral franchise." *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich at 17-18. The state has not done so here—and neither have the lead opinion nor the concurrence. What is the plausible basis for a deadline that disenfranchises thousands of voters who cast absentee ballots in perfect concordance with all the rules? Proclaiming "there must be a deadline" hardly qualifies as a justification for the actual deadline under consideration. Simply put, neither of my colleagues have put forward a single state interest served by failing to count ballots that arrive the day after an election, or the day after that.

The lead opinion's discourse on a voter's "choice" is equally ill founded. Despite recognizing that Michigan voters now have a constitutional right to vote by mail, the lead opinion reduces the right to a quotidian choice. "[W]hen choosing to submit an absentee ballot by mail," the lead opinion lectures, "one assumes the risk that the ballot will not arrive by the deadline."[7] I am unaware of any legal principle supporting that a constitutional right may be dimmed or ignored

---

[7] Ironically, the lead opinion adopts this rule after recounting the story of a letter that remained undelivered to the intended recipient for 81 years. Apparently, the lead opinion has no quarrel with the notion that voters must meekly surrender their constitutional rights to the vicissitudes of the United States Postal Service.

simply because there is an alternate method available for exercising it. We assume the risk that a route we choose to drive may have potholes, or that the bag of potatoes we select at the grocery may include some rotten ones. Constitutional rights are not a game of "gotcha," penalizing with a possible forfeit those who exercise them properly. Citizens may now vote by mail. They may also vote in person. The two rights are constitutionally coequal. Just as the Legislature may not unnecessarily burden one, it may not unnecessarily burden the other.

Moreover, the amendment approved by the people provides that "[a]ll rights set forth in this subsection shall be self-executing." Const 1963, art 2, § 4(1). A self-executing constitutional provision " 'supplies a sufficient rule, by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced[.]' " *Thompson v Secretary of State*, 192 Mich 512, 520; 159 NW 65 (1916), quoting Cooley, Constitutional Limitations (7th ed), p 121. This means that "[l]egislation is not imperatively necessary to give it effect." *Hamilton v Deland*, 227 Mich 111, 115; 198 NW 843 (1924). While legislation "in aid" of a constitutional provision or designed to "better protect" the provision may be enacted, " 'all such legislation must be subordinate to the constitutional provision, and in furtherance of its purpose, and must not in any particular attempt to narrow or embarrass it.' " *Id.* at 116-117, quoting Cooley, Constitutional Limitations (7th ed), p 122. Legislation that "curtail[s]" or places "undue burdens" on a self-executing constitutional right is prohibited. *Wolverine Golf Club v Hare*, 24 Mich App 711, 725; 180 NW2d 820 (1970), aff'd *Wolverine Golf Club v Hare*, 384 Mich 461, 466; 185 NW2d 392 (1971).

The provisions added to Const 1963, art 2 clearly grant voters a specific right to vote by mail, and declare the right to be self-executing. The right to vote by mail and to have one's vote counted are not abstract concepts requiring further legislative explication or definition. Accordingly, legislation is not required to accomplish the will of the people, and legislation that "curtails" or unduly burdens the right cannot be enforced.

III

"The primary purpose of the writ of mandamus is to enforce duties created by law[.]" *State Bd of Ed v Houghton Lake Community Sch*, 430 Mich 658, 667; 425 NW2d 80 (1988). A writ may issue "if the plaintiffs prove they have a clear legal right to the performance of [a] specific duty" and "that the defendant has a clear legal duty to perform" a specific act. *In re MCI Telecom Complaint*, 460 Mich 396, 443; 596 NW2d 164 (1999) (cleaned up). Those requirements are met here.

"[A] clear legal right is . . . founded in, or granted by, law; a right which is inferable as a matter of law from uncontroverted facts regardless of the difficulty of the legal question to be decided." *Rental Props Owners Ass'n of Kent Co v Kent Co Treasurer*, 308 Mich App 498, 519; 866 NW2d 817 (2014) (cleaned up). As discussed above, an absent voter's right to have her vote counted is readily inferable as a matter of law. Indeed, as the lead opinion concedes, it would be "absurd" to think otherwise. Absent voters who meet the requirements for voting, follow the rules, and mail their ballots before the deadline have a constitutional right to have their votes counted. Lest there be any doubt, Article 2, § 4 itself provides: "This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes." The Secretary, too, is bound by this commandment.

I would grant the motion for mandamus and order the Secretary to instruct the clerks that timely mailed absent voter ballots that arrive after the close of the polls and before the date of the canvass must be counted.[8]


/s/ Elizabeth L. Gleicher

---

[8] I take no position on the additional issues raised by plaintiffs, as the first constitutional issue they raise is dispositive. I concur with the lead opinion in result only that the Constitution does not require local clerks to provide return postage for absent voter ballots.